

FILED

OCT 2 1 2016

CLERK, US DISTRICT COURT
NORFOLK, VA

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

SABINA M. HAYDU,

          **Plaintiff,**

v.                                        Civil Action No. _2:16cv 624_

**TIDEWATER COMMUNITY COLLEGE,**

**and**

**THE STATE BOARD OF COMMUNITY COLLEGES,**
**aka the Virginia Community College System,**

          **Defendants.**

## COMPLAINT

    Sabina M. Haydu, by counsel, files this Complaint and demands judgment against

Defendants on the grounds and in the amounts set forth below.

### INTRODUCTION

    1.    Plaintiff is a native of Azerbaijan.  She fled Azerbaijan due to persecution during

a period of political upheaval there, and emigrated to the United States.  She made her home in

Virginia Beach, and found employment at Tidewater Community College.   Her employment at

TCC went well until 2009, when certain TCC employees began a campaign of discrimination

and harassment against her based on her national origin (her accent) and her religion (Jewish).

When she complained to TCC management, the employees retaliated against her for doing so.

TCC management did nothing to remedy the discrimination, harassment, and retaliation, despite

being fully aware of it, and instead threatened Plaintiff if she continued "acting like a victim."

This action is brought pursuant to Title VII of the Civil Rights Act of 1964 seeking a remedy for

unlawful discrimination against Plaintiff on the basis of national origin and religion, and for

unlawful retaliation against Plaintiff for reporting and opposing such discrimination.

## PARTIES

2.      Plaintiff Sabina M. Haydu ("Haydu" of "Plaintiff") is an individual residing in the

City of Virginia Beach, Virginia.

3.      Defendant the State Board for Community Colleges is a corporation organized

and existing under law of the Commonwealth of Virginia, Virginia Code § 23-214 *et seq.* until

October 1, 2016, and thereafter Virginia Code § 23.1-2900 *et seq.*, which establishes, controls,

and administers a statewide system of publically supported comprehensive community colleges,

and which also is known as the Virginia Community College System ("VCCS").

4.      Defendant Tidewater Community College ("TCC") is a community college with

locations in the Hampton Roads region of Virginia, and is established, owned, operated and

controlled by VCCS. To the extent TCC is not an independent legal entity, it is an arm or

operating unit of VCCS.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 42

U.S.C. § 2000e-5 (Title VII of the Civil Rights Act of 1964).

6.      Venue is proper in this district pursuant to 42 U.S. Code § 2000e–5(f)(3) because

this District is in the State in which the unlawful employment practice is alleged to have been

committed, is the judicial district in which the employment records relevant to such practice are

maintained and administered, and is the judicial district in which Plaintiff would have worked

but for the alleged unlawful employment practice.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.      On or about December 4, 2013, Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), charge number 437-2014-00137, a copy of which is attached hereto as Exhibit 1.

8.      On or about September 12, 2014, Plaintiff filed an amended charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), charge number 437-2014-00137, a copy of which is attached hereto as Exhibit 2.

9.      After investigating Plaintiff's charge, the EEOC issued and served upon Defendants a written determination dated November 25, 2015, a copy of which is attached hereto as Exhibit 3 ("EEOC Determination"), finding Defendants discriminated against Plaintiff on the basis of Plaintiff's religion by subjecting Plaintiff to a hostile work environment.

10.     The EEOC attempted conciliation of Plaintiff's Charge of Discrimination, but was unable to attain resolution, and on or about March 4, 2016 issued a written notice to Plaintiff, a copy of which is attached hereto as Exhibit 4, that the EEOC forwarded the case to the United States Department of Justice.

11.     On or about June 6, 2016, the United States Department of Justice issued a Notice of Right to Sue, a copy of which is attached hereto as Exhibit 5.

12.     This action was filed within 90 days of Haydu's receipt of the aforementioned Notice of Right to Sue, as extended by agreement with Defendants.

13.     Haydu has satisfied all procedural prerequisites for the filing of this action.

## FACTS COMMON TO ALL COUNTS

14.     Plaintiff is a native of the Republic of Azerbaijan who emigrated to the United States of America as a refugee and at all relevant times has been a citizen of the United States of America.

15.     Plaintiff is and at all relevant times has been fluent in English.

16.     Plaintiff speaks and at all relevant times has spoken with an Azerbaijani accent.

17.     Plaintiff is and at all relevant times has been Jewish.

18.     Plaintiff began employment with TCC in or about May of 2003 as a work-study student.

19.     Beginning in approximately 2005, Plaintiff was employed by TCC as an Enrollment and Records Specialist at the Virginia Beach campus of TCC ("TCC Virginia Beach").

20.     During Plaintiff's employment with TCC, TCC employees subjecting Plaintiff to discrimination and harassment on the basis of her national origin (accent) and her religion (Jewish), and subjected her to retaliation for opposing that discrimination and harassment.  TCC failed and refused to take corrective action, and itself condoned and participated in such discrimination, harassment and retaliation.   These actions by coworkers and TCC created a hostile and offensive work environment for Plaintiff.

21.     On or about April 13, 2012, Takisha Sawyer ("Sawyer"), one of Plaintiff's coworkers, became irate and screamed at Plaintiff when Plaintiff made a harmless mistake sorting some files.  Plaintiff asked another coworker, Enrollment and Records Specialist Cynthia Byrd to intervene, but Byrd supported Sawyer without making any inquiry about the situation. Plaintiff immediately enlisted the assistance of a supervisor Vera Holmes ("Holmes"), to address

4

the situation.  While Plaintiff was speaking with Holmes, Sawyer, in front of Holmes, again screamed and ranted at Plaintiff, and threatened Plaintiff, who at the time was pregnant, with physical violence.  Holmes directed Plaintiff go to Holmes' office, and Plaintiff complied. Meanwhile, Holmes spoke with Sawyer outside the building.  Plaintiff was in fear for her safety, and so called the TCC Human Resources Department ("TCC HR").  At the direction of TCC HR, later that day Plaintiff met with TCC HR representative Jill Adams ("Adams") and reported the incident, and on April 18, 2012, submitted a written (email) report of the incident to Adams and Plaintiff's supervisor, Sonya Fitchett ("Fitchett").  In the report, Plaintiff stated repeatedly that she felt she was being subjected to "discrimination" or "discriminating" conduct.

22.     Cynthia Byrd ("Byrd"), a TCC employee who worked in the same office as Plaintiff, continually discriminated against, harassed, and retaliated against Plaintiff in very overt ways.  Byrd frequently told Plaintiff that Plaintiff was not born in this country (United States), and that Plaintiff should leave TCC and go back to where she came from.  Byrd told Plaintiff not to speak her native language in the office or to students.  Byrd told Plaintiff to "loose" Plaintiff's accent.  Byrd told Plaintiff that Plaintiff was not able to speak English.  Byrd told Plaintiff that no one liked her and that she was not part of their "team."  Byrd also discriminated against, harassed, and retaliated against Plaintiff in a variety of more subtle but effective ways.  Byrd repeatedly followed Plaintiff into the restroom for no reason other than to cause Plaintiff to feel uncomfortable.  Byrd frequently scrutinized everything Plaintiff did and said, while not doing so to any of the other employees.  Byrd held Plaintiff to requirements for clocking in and out much stricter than those applied to other employees.  Byrd told Plaintiff that Plaintiff would be fired if Plaintiff was three minutes early or three minutes late on three occasions, while allowing all the other employees leniency in regard to arrival times.  Byrd refused to allow Plaintiff to make up

5

for missed work time while allowing the other employees in the office to do so. Byrd often refused to grant Plaintiff time off, while liberally granting time off to the other employees. In all these ways, and others, Byrd made it clear to Plaintiff that Plaintiff was unwelcome at that workplace, and created a hostile work environment for Plaintiff.

23.     Shaunita Sykes ("Sykes"), another TCC employee who worked in the same office as Plaintiff, also engaged in discrimination, harassment and retaliation against Plaintiff. As an example, Sykes changed Plaintiff's work schedule for January 2013 in a way she knew would interfere with Plaintiff's ability to light the Shabbat candles on Friday evenings, which is important in Judaism, and knowing the schedule would cause difficulties with the day-care schedule for Plaintiff's child. Sykes gave Plaintiff's work schedule to Takisha Sawyer, under the pretext that Sawyer had more seniority that Plaintiff, when in fact Plaintiff had been employed by TCC longer than Sawyer, and seniority was not used as a basis for changing the work schedule of any other employee in that office. On several occasions Sykes told Plaintiff that Plaintiff should leave TCC and go back to where she came from.

24.     Plaintiff reported the discrimination and harassment to TCC HR. On July 8, 2013, for example, Plaintiff sent an email to Beth Lunde ("Lunde") at TCC HR, reporting specific discrimination concerns. She also made Adams and TCC Human Resources Director Gretna Smith ("Smith") aware of the situation. TCC, however, took no action to correct or, to the best of Plaintiff's knowledge, even investigate it.

25.     On or about July 12, 2013, Michelle Barnes ("Barnes") became Plaintiff's direct supervisor. After learning that Plaintiff is Jewish, Barnes treated Plaintiff with hostility and disrespect. Barnes regularly referred to Plaintiff as the "Jew girl."

6

26.     Plaintiff tried to obtain assistance from Barnes in regard to the discrimination and harassment to which Plaintiff was being subjected by coworkers, but Barnes would not discuss it with her (before Plaintiff went to TCC Dean Marilyn Hodge).

27.     On July 18, 2013, Plaintiff sent an email to Smith requesting a meeting to discuss Plaintiff's concerns.  Smith did not reply to the email, nor did anyone else.

28.     Because of the animosity and indifference demonstrated by Barnes, Plaintiff went to the office of TCC Dean Marilyn Hodge ("Hodge") and asked to speak with Hodge about Plaintiff's concerns.  Hodge, through Hodge's secretary, refused to speak with Plaintiff, and told Plaintiff to speak with Barnes.

29.     Plaintiff went back to Barnes, and Barnes met with Plaintiff.  Barnes told Plaintiff, in a loud and rude tone, "You need to stop sending emails to HR.  They are tired of you.  You should apply to other places - ODU - Bryant & Stratton.."  Plaintiff requested that Plaintiff be transferred to a different office.  Barnes replied, "Nobody wants you in their office, you will not get a job here, nobody likes you!"  Plaintiff tried to explain to Barnes that Plaintiff tried to talk to Barnes before going to HR.  Barnes interrupted her, exclaiming, "You are good at sending emails to HR....!"  Hodge then entered the meeting.  Hodge told Plaintiff that Hodge was not here to change Barnes' behavior.  Hodge said to Plaintiff, "I am aware of discrimination against your ethnic background.  I do not have a place to transfer you or put you into a different office.  I will contact HR, and we will have a meeting."

30.     On July 25, 2013, Plaintiff again met with Hodge and Barnes.  The meeting lasted less than five minutes.  The meeting began by Hodge telling Plaintiff, "I know you have been discriminated against because of your ethnic background."  Barnes then told Plaintiff, "You should have not gone to HR."  Barnes said, "You should just let it go - Move on."  Plaintiff told

7

Hodge that Plaintiff had been applying for different jobs within TCC. Hodge replied, "To be honest, if someone contacts me, I will just tell the truth, I will not give a good reference about you. I will just let them know that you have been discriminated against and you complained. You should focus on you job.... You should not go to HR." Barnes then told Plaintiff, "If you are not happy here, you should look for a job in different places. You will not have an opportunity to grow here at TCC; nobody wants you in their office." Hodge stated, "I agree, this place is where people talk to each other, and nobody will give you a job because of discrimination against you and you reported about it to HR." Hodge then got up, and walked out of the meeting saying, "I have important things to do." Barnes followed Hodge out, looking at Plaintiff mockingly and stating "I have important things to do, too." Plaintiff was shocked, and sat in the meeting room for a couple of minutes thinking about what Hodge and Barnes had just said to her. She then went back to work, feeling that her situation was hopeless.

31.     Subsequently on July 25, 2013, Plaintiff again sent an email to Smith requesting a meeting to discuss Plaintiff's concerns. Smith replied to Plaintiff by email, telling Plaintiff that Smith had spoken to Adams about a job in which Plaintiff was interested.

32.     In or about October of 2013, TCC Virginia Beach Campus Provost Michael Summers ("Summers") assigned Marilyn Medley ("Medley") to "clean up" Plaintiff's office.

33.     On or about October 31, 2013, Medley met with Plaintiff. She told Plaintiff that Summers had directed her to "clean up" Plaintiff's office. Medley began by telling Plaintiff that Plaintiff is "good at going to HR," and by reviewing what had taken place up to the time of the meeting. Medley then told Plaintiff, "I am going to change you." Medley asked, "Who is Sabina?" Plaintiff began to describe her departure from Azerbaijan with two small children after being granted refugee status by the United States, and that when she came to the United States

8

she spoke little English. Medley put her hands on her face, laughed, and said, "No one wants you in their office, no one likes you, you will not be hired or move up." Medley then exclaimed, "Stop acting like a victim! I am going to change you!" Medley said she was aware that Plaintiff is from a "strong culture." Unsure of what she meant, Plaintiff asked her if she knew where Plaintiff was from. Medley said she did not. This made it clear to Plaintiff that the "strong culture" to which Medley was referring meant that fact that Plaintiff is a Jew. Medley then told Plaintiff, "You are acting like a victim! Stop acting like a victim!" Medley said she knew Plaintiff had been hurt, but told her she did not care about Plaintiff's feelings and did not want to hear about them. Medley told Plaintiff that her problems arose because Plaintiff went to TCC HR about her concerns. Plaintiff again tried to discuss her concerns with Medley, but Medley would not listen to them. Medley said everything done before was "in the past," and that Medley would not discuss the prior actions of her coworkers. When Plaintiff tried again to express her concerns, Medley raised her hand and told Plaintiff that Plaintiff was being insubordinate. Medley made it clear to Plaintiff that neither Medley nor TCC would listen to any further complaints, and that if Plaintiff continued to complain she could be fired.

34.     On or about November 8, 2013, Plaintiff was not feeling well, and her infant child also was not well. Plaintiff called Medley and left a message that Plaintiff would not be at work that day for those reasons. Medley called Plaintiff a short time later, and demanded that Plaintiff report for work. Plaintiff complied. Medley's treatment of Plaintiff was completely different and less favorable that the normal treatment of employees in that office requesting sick leave or family leave.

35.     During 2013, perhaps in a misguided effort to help Plaintiff, Medley and another employee, Kelly Potts ("Potts"), began forcing their religion upon Plaintiff. They made Plaintiff

9

hold their hands, close her eyes, and repeat prayers after them. In addition, Potts frequently

urged Plaintiff to attend church with her. These actions occurred most frequently on Fridays,

and eventually led Plaintiff to stop working on Fridays.

36.     On November 21, 2013, Plaintiff sent another email to Smith requesting a

meeting to discuss Plaintiff's concerns. Again, Smith did not reply to the email, nor did anyone

else.

37.     On December 4, 2013, Plaintiff filed a Charge of Discrimination with the EEOC,

charge number 437-2014-00137 (Exhibit 1), and Defendants received a copy of it within a short

time thereafter.

38.     Because of the discrimination, harassment and retaliation to which Plaintiff was

subject at TCC Virginia Beach, Plaintiff transferred to the Chesapeake Campus of TCC ("TCC

Chesapeake") effective January 20, 2014.

39.     At TCC Chesapeake, Plaintiff's direct supervisor was Admissions Coordinator

Holly Estrada ("Estrada").

40.     Upon starting work at TCC Chesapeake, Plaintiff was again subjected to

discrimination, harassment, and a hostile work environment.

41.     At TCC Chesapeake, Plaintiff worked in the admission office with Stephanie

Cooper ("Cooper"). The job duties of Cooper were comparable to those of Plaintiff.

42.     Beginning on the first day Plaintiff worked at TCC Chesapeake, Cooper

repeatedly questioned Plaintiff about Plaintiff's national origin and ethnic background. Cooper's

questioning was unwelcome and offensive to Plaintiff, and Plaintiff informed Cooper of that.

43.     Cooper disliked Plaintiff's accent, national origin, and ethnicity, and because of

that Cooper immediately disliked Plaintiff.

10

44.     Cooper made her dislike for Plaintiff obvious, treated Plaintiff with hostility, rudeness, and disrespect, and created a work environment which was hostile and offensive to Plaintiff.

45.     In April of 2014, Plaintiff complained to Estrada more than once about Cooper's conduct toward Plaintiff. Estrada took no corrective action, and on one occasion told Plaintiff to "take a walk."

46.     In early May of 2014, Plaintiff met in Estrada's office with Estrada and Cooper concerning Cooper's conduct toward Plaintiff. In that meeting, Cooper acknowledged her conduct toward Cooper but expressly refused to change it. Cooper expressed her extreme dislike for Plaintiff's accent, and told Estrada that Plaintiff should be taught how to speak English. Cooper called Plaintiff names and exhibited extreme disrespect toward Plaintiff. Cooper made references to Plaintiff's prior difficulties at TCC Virginia Beach. Cooper refused to acknowledge that her conduct was inappropriate, and instead insisted it was completely appropriate. Estrada told Plaintiff and Cooper that both of them will be fired if they do not get along, ordered them to resolve the situation between themselves, and left the room. While alone in the room with Plaintiff, Cooper told Plaintiff that Cooper hated Plaintiff's accent, and suggested Plaintiff should go back to where she came from. Plaintiff was justifiably unwilling to be subjected to further verbal attacks by Cooper, and so returned to her desk.

47.     About 15 minutes later, Estrada summoned Plaintiff back to Estrada's office, where the meeting with Cooper resumed. A long discussion ensued, but Cooper continued to insist her conduct was appropriate. In the conversation, Plaintiff explained that she had left her job at TCC Virginia Beach and come to TCC Chesapeake to get away from this kind of

discrimination and harassment.  Cooper replied that Plaintiff should likewise leave TCC Chesapeake if Plaintiff did not like the work environment there.

48.     Based on the two meetings, it was obvious to Estrada that Cooper was discriminating against Plaintiff because of Plaintiff's accent, ethnicity and national origin, that Copper was creating a hostile and offensive work environment for Plaintiff, and that Cooper would continue to do so.  Estrada should have taken disciplinary action against Cooper, and should have protected Plaintiff from further discrimination and harassment by Cooper, but instead did nothing.  By doing so Estrada, and TCC, condoned the unlawful discrimination, harassment, and hostile work environment to which Plaintiff was being subjected at TCC Chesapeake.

49.     Because of Cooper's ongoing discrimination and harassment against Plaintiff and the hostile work environment it created for Plaintiff, and because Estrada refused to take corrective action, on or about May 9, 2014 Plaintiff resigned from her employment with TCC.

50.     Plaintiff's resignation from TCC constituted a constructive discharge of Plaintiff by TCC.

51.     On or about May 14, 2014, Plaintiff sent an email to TCC Director of Human Resources Gretna Smith ("Smith"), in which Plaintiff clearly informed Smith of the discrimination, harassment, and hostile work environment to which Plaintiff was subjected at TCC Chesapeake.  Had Smith made a good faith offer to take corrective action, Plaintiff would have continued in her employment at TCC.  Smith made no such offer, and in fact did not contact Plaintiff in response to the email.

52.     While Plaintiff was employed by Defendant, Plaintiff applied to TCC for employment in numerous jobs for which Plaintiff was qualified and in which Plaintiff would

have received significantly better pay, benefits, opportunities for advancement, and other terms and conditions of employment compared to the job in which Plaintiff was employed at TCC. In this Complaint, those jobs are referred to as "Alternative Jobs."

53.     TCC denied all such applications by Plaintiff for Alternative Jobs, although Plaintiff was more qualified for some or all of those jobs than the individual who TCC placed in the Alternative Job.

54.     One such Alternative Job was the position of Education Support Specialist III, Academic Advisor - Military Program, job #00525, for which Plaintiff applied in or about June 2013. Plaintiff was substantially more qualified for that position than the individual, Shirley Robuste, who was placed in that job, and who was not of foreign national origin and was not Jewish.

55.     One such Alternative Job was the position of Academic and Office Specialist III, Administrative Assistant to the Director of Human Resources, job # 00162, for which Plaintiff applied in or about October 2013. Plaintiff was interviewed for the position by Adams and TCC employee Okema Bowers ("Bowers"). Adams, Bowers, and Smith told Plaintiff that Plaintiff would be placed in the position. In or about February of 2014, however, an individual was placed in that job who was not of foreign national origin and was not Jewish.

56.     One such Alternative Job was the position of Counselor, job #FA393. Plaintiff applied for that job, but in or about March of 2014 the job an individual was placed in that job who was not only substantially less qualified than Plaintiff but in fact was unqualified because, unlike Plaintiff, she lacked a bachelor's degree which was a prerequisite for the position.

57.     One such Alternative Job was the position of Administrative and Office Specialist III, Administrative Assistant, job #00662. Plaintiff applied for that job, but in or about April of

13

2014 TCC, rather than placing Plaintiff in the position, chose to leave the position unfilled. When the job subsequently was re-advertised, Plaintiff applied for it again. In or about October of 2014 an individual was placed in that job who was substantially less qualified than Plaintiff.

58.     TCC denied Plaintiff's employment applications, including but not necessarily limited to those mentioned above, based on her national origin (her accent) and her religion (Jewish), in retaliation for Plaintiff opposing such discrimination against her, and in retaliation for her filing her Charge of Discrimination with the EEOC.

## COUNT 1

### DISCRIMINATION ON THE BASIS OF NATIONAL ORIGIN IN VIOLATION OF TITLE VII

59.     The allegations in this Complaint set forth above are incorporated into this Count by reference as if fully set forth herein.

60.     By actions described above, employees of Defendants, acting in the scope of their employment, subjected Plaintiff to unlawful discrimination and harassment on the basis of her national origin, and subjected Plaintiff to a work environment which Plaintiff reasonably found hostile and offensive, all in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

61.     Defendants were aware of the aforementioned discrimination, harassment, and hostile work environment, but failed and refused to take prompt or effective corrective action.

62.     As a direct and proximate result thereof, Plaintiff has suffered and will continue to suffer loss of employment and the privileges and benefits thereof including but not necessarily limited to earnings, employee benefits, seniority, and employee benefits; has suffered and will continue to suffer injury to her personal and professional reputation; Plaintiff has suffered and will continue to suffer great inconvenience, expense, and loss; and Plaintiff has suffered and will

14

continue to suffer severe mental anguish and emotional distress, including but not necessarily limited to embarrassment, humiliation, anxiety, panic attacks, depression, sadness, hopelessness, loss of self-esteem, and loss of enjoyment of life, accompanied by physical symptoms including but not necessarily limited to fatigue, sleeplessness, and crying, as a result of which Plaintiff has incurred and will continue to expend money and time for care and treatment by health care providers and medications.

WHEREFORE Haydu demands judgment against Defendants and as relief demands the following:

     a.     Back pay in an amount to be determined at trial.

     b.     Front pay in an amount to be determined at trial;

     c.     Compensatory damages in amount not less than $500,000;

     d.     A declaratory judgment finding Defendants violated Title VII;

     e.     Pre-judgment interest;

     f.     Post-judgment interest;

     g.     Plaintiff's costs and expenses incurred herein including but not limited to expert witness fees and reasonable attorney's fees; and

     h.     Such other and further relief as the interests of justice may require.

Plaintiff demands TRIAL BY JURY on this Count.

## COUNT 2

### DISCRIMINATION ON THE BASIS OF RELIGION
### IN VIOLATION OF TITLE VII

63.     The allegations in this Complaint set forth above are incorporated into this Count by reference as if fully set forth herein.

64.     By actions described above, employees of Defendants, acting in the scope of their employment, subjected Plaintiff to unlawful discrimination and harassment on the basis of her religion, and subjected Plaintiff to a work environment which Plaintiff reasonably found hostile and offensive, all in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.

65.     Defendants were aware of the aforementioned discrimination, harassment, and hostile work environment, but failed and refused to take prompt or effective corrective action.

66.     As a direct and proximate result thereof, Plaintiff has suffered and will continue to suffer loss of employment and the privileges and benefits thereof including but not necessarily limited to earnings, employee benefits, seniority, and employee benefits; has suffered and will continue to suffer injury to her personal and professional reputation; Plaintiff has suffered and will continue to suffer great inconvenience, expense, and loss; and Plaintiff has suffered and will continue to suffer severe mental anguish and emotional distress, including but not necessarily limited to embarrassment, humiliation, anxiety, panic attacks, depression, sadness, hopelessness, loss of self-esteem, and loss of enjoyment of life, accompanied by physical symptoms including but not necessarily limited to fatigue, sleeplessness, and crying, as a result of which Plaintiff has incurred and will continue to expend money and time for care and treatment by health care providers and medications.

WHEREFORE Haydu demands judgment against Defendants and as relief demands the following:

a.     Back pay in an amount to be determined at trial.

b.     Front pay in an amount to be determined at trial;

c.     Compensatory damages in amount not less than $500,000;

16

d.      A declaratory judgment finding Defendants violated Title VII;

e.      Pre-judgment interest;

f.      Post-judgment interest;

g.      Plaintiff's costs and expenses incurred herein including but not limited to expert witness fees and reasonable attorney's fees; and

h.      Such other and further relief as the interests of justice may require.

Plaintiff demands TRIAL BY JURY on this Count.

## COUNT 3

### RETALIATION FOR OPPOSING DISCRIMINATION AND HARASSMENT IN VIOLATION OF TITLE VII

67.     The allegations in this Complaint set forth above are incorporated into this Count by reference as if fully set forth herein.

68.     By actions described above, employees of Defendants, acting in the scope of their employment, retaliated against Plaintiff for opposing unlawful discrimination and harassment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

69.     As a direct and proximate result thereof, Plaintiff has suffered and will continue to suffer loss of employment and the privileges and benefits thereof including but not necessarily limited to earnings, employee benefits, seniority, and employee benefits; has suffered and will continue to suffer injury to her personal and professional reputation; Plaintiff has suffered and will continue to suffer great inconvenience, expense, and loss; and Plaintiff has suffered and will continue to suffer severe mental anguish and emotional distress, including but not necessarily limited to embarrassment, humiliation, anxiety, panic attacks, depression, sadness, hopelessness, loss of self-esteem, and loss of enjoyment of life, accompanied by physical symptoms including but not necessarily limited to fatigue, sleeplessness, and crying, as a result of which Plaintiff has

incurred and will continue to expend money and time for care and treatment by health care providers and medications.

WHEREFORE Haydu demands judgment against Defendants and as relief demands the following:

a.      Back pay in an amount to be determined at trial;

b.      Front pay in an amount to be determined at trial;

c.      Compensatory damages in amount not less than $500,000;

d.      A declaratory judgment finding Defendants violated Title VII;

e.      Pre-judgment interest;

f.      Post-judgment interest;

g.      Plaintiff's costs and expenses incurred herein including but not limited to expert witness fees and reasonable attorney's fees; and

h.      Such other and further relief as the interests of justice may require.

Plaintiff demands TRIAL BY JURY on this Count.

## COUNT 4

### RETALIATION FOR FILING CHARGE OF DISCRIMINATION IN VIOLATION OF TITLE VII

70.     The allegations in this Complaint set forth above are incorporated into this Count by reference as if fully set forth herein.

71.     By actions described above, employees of Defendants, acting in the scope of their employment, retaliated against Plaintiff for filing her Charge of Discrimination (Exhibit 1) in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

72.     As a direct and proximate result thereof, Plaintiff has suffered and will continue to suffer loss of employment and the privileges and benefits thereof including but not necessarily

18

limited to earnings, employee benefits, seniority, and employee benefits; has suffered and will continue to suffer injury to her personal and professional reputation; Plaintiff has suffered and will continue to suffer great inconvenience, expense, and loss; and Plaintiff has suffered and will continue to suffer severe mental anguish and emotional distress, including but not necessarily limited to embarrassment, humiliation, anxiety, panic attacks, depression, sadness, hopelessness, loss of self-esteem, and loss of enjoyment of life, accompanied by physical symptoms including but not necessarily limited to fatigue, sleeplessness, and crying, as a result of which Plaintiff has incurred and will continue to expend money and time for care and treatment by health care providers and medications.

WHEREFORE Haydu demands judgment against Defendants and as relief demands the following:

a. Back pay in an amount to be determined at trial.

b. Front pay in an amount to be determined at trial;

c. Compensatory damages in amount not less than $500,000;

d. A declaratory judgment finding Defendants violated Title VII;

e. Pre-judgment interest;

f. Post-judgment interest;

g. Plaintiff's costs and expenses incurred herein including but not limited to expert witness fees and reasonable attorney's fees; and

h. Such other and further relief as the interests of justice may require.

Plaintiff demands TRIAL BY JURY on this Count.

**SABINA M. HAYDU**

By: _____
    Of Counsel

Raymond L. Hogge, Jr.
VSB No. 29445
Counsel for Sabina M. Haydu
Hogge Law
500 E. Plume Street, Suite 800
Norfolk, VA 23510
Tel: (757) 961-5400
Fax: (757) 962-5979
rayhogge@virginialaborlaw.com

Jennifer Tatum Atkinson
VSB No. 44592
Counsel for Sabina M. Haydu
Hogge Law
500 E. Plume Street, Suite 800
Norfolk, VA 23510
Tel: (757) 961-5400
Fax: (757) 962-5979
jatkinson@hoggelaw.com